UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ──────────────────────── | ) |
| UNITED STATES OF AMERICA, | ) |
|             Plaintiff, | ) |
|  | ) |
|            v. | ) CRIMINAL NO. 06-10292-PBS-7 |
|  | ) |
| ALEJANDRO NAVA-RUIZ, | ) |
|             Defendant. | ) |
| ──────────────────────── | ) |

**MEMORANDUM AND ORDER**

September 28, 2007

Saris, U.S.D.J.

## I.  **INTRODUCTION**

The defendant moves to suppress out-of-court and in-court identifications made of the defendant as a result of an unduly suggestive identification procedure which took place on July 14, 2006.[1]  In support of his motion, the defendant argues that the identification procedure used -- of presenting a single photo to a police officer witness -- was unduly suggestive and that the identification was otherwise unreliable. After an evidentiary hearing on September 7, 2007, the motion is **DENIED**.

## II.  **BACKGROUND**

A.  Surveillance of a "Mexican Male"

───────────────

[1] The defendant previously moved to suppress any items seized as a result of the out-of-court identification, and any "fruits" of the search, including but not limited to any information learned by the government as a result of the identification of the defendant as well as any items recovered from the defendant at the time of his arrest.  (Def. Mot. at 1). At the evidentiary hearing held on September 7, 2007, the defendant limited his request for relief to the suppression of the out-of-court identification and the in-court identification made at the hearing.  (Tr. 106).

As part of an ongoing investigation of the drug distribution ring of Camilo Cury, federal and state law enforcement agents conducted surveillance and wiretaps on several individuals. During the course of one four-month wiretap, law enforcement intercepted numerous telephone conversations between Cury and an individual called "Alex" discussing cocaine and heroin trafficking activities.

In intercepted conversations occurring between July 11 and July 13, 2006 Cury and "Alex" arranged to meet in Boston so that Cury could return an amount of "black tar"[2] heroin to "Alex" that Cury had difficulty selling in Boston.  "Alex" was to fly into Boston, pick up the heroin, drive to Newark in a rental car, and fly back from Newark.  Law enforcement agents believed, based on these conversations, prior surveillance, and other information, that the heroin was kept at a location on 18 Dacia Street in Dorchester, Massachusetts.

On July 13, 2006, a little before 1:00 p.m., Lt. Det. Michael Stewart began conducting surveillance near the 18 Dacia Street location.  At the time Lt. Det. Stewart, a Scituate Police Department police officer for twenty-four years assigned to the FBI's High Intensity Drug Trafficking Area ("HIDTA") Task Force, was a surveillance supervisor for the four-month wiretap.  Lt. Det. Stewart was instructed to look out for Cury traveling with a "Mexican male" to pick up a quantity of heroin from a third

---

[2] "Black tar" heroin is a type of heroin grown principally in Mexico and usually sold in the western United States.  (See Tr. 61-62).

person.  Lt. Det. Stewart was not told that the male was named "Alex," nor was he told that the male was coming from any particular state.

Lt. Det. Stewart conducted his surveillance of the 18 Dacia Street location from inside of a white Dodge construction van equipped with two nonworking cameras.  The van was parked on Dacia Street, a one way street.  The back of the van faced an intersection where a side street, Wayland Street, meets Dacia Street from the same side of the street as the van.  The back of the van was approximately two car lengths from the Wayland Street intersection.  (Tr. 8-10; Gov't Ex. 1).

The back of the van had two square windows, each approximately 18" by 18", covered with black vinyl covers to prevent individuals from looking into the van.  Lt. Det. Stewart was able to observe out of the back of the van by peeling back the vinyl cover of one window and looking out of an approximately 3" by 3" corner of the window.  Despite the small space, Lt. Det. Stewart had "full vision from anything I could see coming off of Wayland Street to [a] store" directly across Dacia Street.  (Tr. 26).  The weather was clear.  (Gov't Ex. 4).

At about 2:00 p.m., Lt. Det. Stewart observed Cury walking with a "Hispanic male shorter than . . . Cury, heavyset and [with] a round face" walking off of Wayland Street onto Dacia Street.  (Tr. 7).  The two met with the driver of a Ford Explorer parked along the same side of Dacia Street as the surveillance van, facing the back of the van and "just the other side of

3

Wayland Street." (Tr. 10-12, Gov't Ex. 1). The driver of the Explorer was a black Hispanic male wearing a New York Yankees hat having a height of around six feet. The Ford Explorer was registered to 18 Dacia Street, and earlier in the day the man in the New York Yankees hat was observed going in and out of 18 Dacia Street.

All three men met and spoke briefly in front of the Ford Explorer. (Tr. 13, Gov't Ex. 1). No cars were parked between the Ford Explorer and the van. The three men were approximately fifty feet away from the back of the van, and Lt. Det. Stewart had an unobstructed view of the Ford Explorer. The men created a triangle. The man in the Yankees hat faced the back of the van, and Cury faced down Wayland Street. The Hispanic male did not face towards the van, but looked around in every direction. The men talked for about a minute. Lt. Det. Stewart then witnessed Cury look down Dacia Street in his direction, turn back to the other two men, "took one more look in [his] direction, and the conversation seemed to end abruptly." (Tr. 15).

Afterwards Cury and the Hispanic male crossed Dacia Street and entered a store. They stayed in the store for less than a minute. They then came out of the store and onto the sidewalk, with Cury crossing Dacia Street and walking to the passenger side of the Ford Explorer. By that time the man in the Yankees hat was seated in the driver's seat of the Explorer. The Hispanic male stayed on the sidewalk in front of the store eating a popsicle or some ice cream, about fifty feet away from the back

of the van.  Lt. Det. Stewart again observed the Hispanic male
eating for about thirty seconds.

Cury signaled for the Hispanic male to join him, and the
Hispanic male walked across Dacia Street as Cury walked away from
the Explorer and towards Wayland Street.  The Explorer
immediately drove off.  Moments after both Cury and the Hispanic
male both walked out of view of Lt. Det. Stewart, the two were
observed in a white Dodge Caliber driving down Wayland Street and
turning onto Dacia Street.  Lt. Det. Stewart observed Cury
driving the vehicle and the Hispanic male in the passenger seat.
Lt. Det. Stewart observed and wrote down the license plate number
of the white Dodge Caliber as it drove past the surveillance van
towards Quincy Street.  He did not follow the car.  Lt. Det.
Stewart sent a radio transmission of the license plate number and
the direction of the car to other surveillance units.  He also
sent a description of the Hispanic male, describing him, in
substance, as "a round-faced individual, medium to heavyset,
shorter than Camilo Cury."  (Tr. 72).  He did not include any
other information in his description, including hair color, eye
color, facial hair, approximate weight, approximate height, or
what he was wearing.

Lt. Det. Stewart observed the Hispanic male accompanying
Cury, in total, for about "a minute and a half."  (Tr. 25).  He
did not take any notes about the Hispanic male's appearance
either during or immediately after observing him.  Lt. Det.
Stewart also did not take any pictures of the Hispanic male or

the vicinity, and has not seen the Hispanic male prior to the
evidentiary hearing on this motion.

At 3:15 p.m., the Ford Explorer, driven by the individual
wearing the Yankees hat, left 18 Dacia Street carrying two dark
trash bags that appeared to contain heavy items and placed them
in a green Mercedes.  The green Mercedes was later pursued and
stopped.  A large quantity of heroin, cocaine, and a 9 mm Smith &
Wesson were found in the two dark trash bags.

B.   The Single Photo Identification

Immediately after receiving information from Lt. Det.
Stewart, law enforcement agents attempted to identify the
Hispanic male accompanying Camilo Cury.  A special agent in the
investigation determined from the license plate number that the
Dodge Caliber was rented from a local Thrifty car rental.  The
special agent also learned who had rented the Caliber, and based
on that information obtained a photo of the individual from the
Arizona Registry of Motor Vehicles.  The photo contained
identifying information about the individual, who was named
"ALEJANDRO RUIZ NAVA."  (Gov't Ex. 2).

Between July 13 and July 14, 2006, the special agent
provided the photograph to case agent Det. Eduardo Dominguez,
Jr., a Boston police detective for twenty-eight years, a member
of the FBI's drug task force, and a co-investigator for the
investigation with FBI special agent Jill Heeter.  Det. Dominguez
had received Lt. Det. Stewart's earlier radio transmission, and
knew that he was the officer conducting surveillance at 18 Dacia

Street on July 13th.

On July 14, 2006, around noon, Lt. Det. Stewart arrived at his office to complete his surveillance log of what he had observed the previous day.  At the time Lt. Det. Stewart had no knowledge of the Hispanic male that accompanied Cury beyond what he had observed, although he testified that he may have learned that the white Dodge Caliber was a rental car.  (See Tr. 52-53, 58).  Lt. Det. Stewart had not been informed of any name for the Hispanic male, or any name associated with the rental car.

Shortly thereafter Det. Dominguez entered Lt. Det. Stewart's office while Stewart was preparing his surveillance log.  After exchanging pleasantries Det. Dominguez presented to Lt. Det. Stewart a single photo that contained identifying information. The photo was the photo previously obtained from the Arizona Registry of Motor Vehicles, although Lt. Det. Stewart did not know at the time how Det. Dominguez came to obtain the photo.  On presenting the photo,  Det. Dominguez inquired, "Does this guy look familiar?"  (Tr. 46).

Lt. Det. Stewart responded by saying, in substance, that "that was the person that was with Camilo Cury the previous day." (Tr. 19, 66, 78).  Lt. Det. Stewart testified that "there was no doubt whatsoever."  (Tr. 19).  Lt. Det. Stewart further testified that the identifying information on the photo did not mean anything to him, and that he felt no pressure to make an identification.  (Tr. 21).  On occasion, Stewart has declined to make positive identifications when shown photographs by police

officers.

Afterward Lt. Det. Stewart spoke briefly with Det. Dominguez about the efforts to identify the Hispanic male, and learned other identifying information, such as the name of the person who rented the Dodge Caliber.  Lt. Det. Stewart then used that information to complete his surveillance log.  He described the Hispanic male in his log as a heavyset, short, Hispanic man with a round face.  (See Tr. 34).[3]

Based in part on this identification, a federal arrest warrant was issued for the defendant, and on November 9, 2006, the defendant was arrested in Phoenix, Arizona.

C.    The In-Court Identification

The defendant subsequently moved to suppress Lt. Det. Stewart's out-of-court identification.  At the evidentiary hearing on the motion, held on September 7, 2007, Lt. Det. Stewart was presented, and identified, the photo Det. Dominguez initially showed him on July 14, 2006.  Lt. Det. Stewart was then asked the following:

    Q: Now do you see that man in the courtroom today?
    A: Yes, I do.
    Q: Would you point him out, please.
    A: He's the gentlemen in the orange suit.

(Tr. 20).  Lt. Det. Stewart described and pointed to the defendant.  No other person in the courtroom was orange-suited. Lt. Det. Stewart also identified the defendant as the person he saw on July 13, 2006.

---

[3] Neither party submitted the surveillance log into evidence.

8

### III.  <u>DISCUSSION</u>

A.   <u>Standard of Review</u>

The standard for determining whether to suppress identification evidence is "that of fairness as required by the Due Process Clause of the Fourteenth Amendment."  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 113 (1977).  Identification evidence should be suppressed only in "extraordinary circumstances." <u>United States v. Watson</u>, 76 F.3d 4, 6 (1st Cir. 1996).

Courts evaluate the fairness of an identification using a two-pronged inquiry.  <u>United States v. de Jesus-Rios</u>, 990 F.2d 672, 677 (1st Cir. 1993).  A court must first determine whether the identification procedure was "impermissibly suggestive." <u>Id.</u>; <u>see also</u> <u>United States v. Maguire</u>, 918 F.2d 254, 263 (1st Cir. 1990).  If not, the analysis ends.  <u>Maguire</u>, 918 F.2d at 263.  If so, the court must decide whether the identification was nevertheless reliable under the totality of the circumstances. <u>de Jesus-Rios</u>, 990 F.2d at 677.

In assessing the reliability of an identification, courts consider five factors:

> 1) the witness's opportunity to view or observe the defendant;
> 2) the witness's degree of attention;
> 3) the accuracy of the witness's description of the defendant;
> 4) the level of certainty demonstrated by the witness at the identification; and
> 5) the length of time between the crime and the identification.

<u>United States v. Smith</u>, 429 F. Supp.2d 440, 448 (D. Mass. 2006) (citing <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972); <u>Manson</u>,

432 U.S. at 114 (1977); de Jesus-Rios, 990 F.2d at 677).  Not all
factors must be present; instead, they are to be examined
together as part of the court's "totality of the circumstances"
inquiry.  de Jesus-Rios, 990 F.2d at 677-78.

"[I]n-court identification testimony is admissible *unless*
its basis, the pretrial identification, has proven so
impermissibly suggestive as to give rise to a very substantial
likelihood of misidentification."  Maguire, 918 F.2d at 264-65
(1st Cir. 1990) (citing Biggers, 409 U.S. at 198; Simmons v.
United States, 390 U.S. 377, 384 (1968)).  "An in-court
identification . . . may nevertheless escape suppression if the
court determines that the in-court testimony is somehow reliable
despite the suggestiveness of the earlier identification
procedure."  Smith, 429 F. Supp. 2d at 449.  Moreover, to the
extent that the identification procedure is *minimally* suggestive,
the First Circuit has considered whether the suggestibility could
be "cured at trial" through cross-examination.  Maguire, 918 F.2d
at 264.

B.    The Suggestibility of the Identification Procedure

The defendant first contends that the identification
procedure used by Det. Dominguez to identify the defendant, of
presenting a single photo to Lt. Det. Stewart, was impermissibly
suggestive, since single photo procedures "present so serious a
danger of suggestiveness as to require that they be given
extremely careful scrutiny."  Nassar v. Vinzant, 519 F.2d 798,
801 (1st Cir. 1975); see also Manson, 432 U.S. at 116

("identifications arising from single-photograph displays may be viewed in general with suspicion."). The defendant further insists that the single photo procedure used in this case is impermissibly suggestive regardless of whether the witness is a civilian or a police officer like Lt. Det. Stewart. (Def. Mem. at 4).

Several courts have analyzed the suggestibility of an identification procedure used for a police officer witness like "that of a normal witness." See United States v. Smith, 429 F. Supp. 2d 440, 448 (D. Mass. 2006) (citing United States v. Lopez-Lopez, 282 F.3d 1, 10 (1st Cir. 2002)). Furthermore the rules and regulations for identification procedures promulgated by the Boston Police Department and the Department of Justice, both of which advise against the use of single photo identification procedures, do not distinguish between civilian and police witnesses. (Tr. 81-83, 87-89; Def. Ex. D at Rule 330, Def. Ex. E. at 33-35). Det. Dominguez, however, testified that single photograph identifications for police officers were the norm and were not viewed as problematic; "I've never seen it done any other way." (Tr. 40).

The first question is whether the single photo identification procedure used in this case was "impermissibly" suggestive given the lack of exigent or emergency circumstances. At the first glance, the case is similar to Smith, where the court found impermissibly suggestive an identification procedure in which the witness, a police officer, was also presented a

11

single photo in the presence of at least one other officer.  In Smith the witness was "clearly aware" that the officer presenting the photo "had been looking for the unknown man" based on prior descriptions from the officer, and therefore "surely knew who the 'guy' in [the] single photo might be."  429 F. Supp. 2d at 450. Similarly, in this case, one can reasonably infer that Lt. Det. Stewart was aware that Det. Dominguez was looking for a specific person, even though in asking if Lt. Det. Stewart recognized the individual in the photo Det. Dominguez did not indicate who the person could be.  Still, Det. Dominguez had not discussed and described the unidentified individual with Lt. Det. Stewart previously, Lt. Det. Stewart had no identifying information about the individual apart from what he observed the day before, and Lt. Det. Stewart felt no pressure to make an identification. Indeed, he had refused to identify suspects in the past.[4]

The Supreme Court held in Manson that an identification based on single photograph left on a police officer's desk was suggestive, but that it was not "corrupting" and was otherwise reliable because, among other things, there was "little pressure on the witness to acquiesce in the suggestion that such a display entails."  432 U.S. at 116.  Holding that reliability is the "linchpin," the Supreme Court has instructed courts to weigh the reliability factors against the "corrupting effect of the

---

[4] One other crucial difference between Smith and this case is that the police officer witness's credibility in Smith was "doubtful" based on "four different accounts of his out-of-court photo identification of" the defendant.  429 F. Supp. 2d at 443. The Court finds no such credibility issues in this case.

12

suggestive identification itself." Id. at 114.

C.  The Reliability of the Identification

Even though the identification procedure used in this case
was suggestive, the Court finds Lt. Det. Stewart's identification
reliable under the totality of the circumstances.  The Court
finds that Lt. Det. Stewart's identification of the defendant,
based upon the single photo shown to him by Det. Dominguez,
sufficiently satisfies four of the five factors used by courts to
determine the reliability of an identification.

1.  Opportunity to Observe

Lt. Det. Stewart had an adequate opportunity to observe the
defendant.  Lt. Det. Stewart observed the defendant
intermittently for approximately one and a half minutes, from
about fifty feet away, out of a 3" by 3" corner of a van window
on an otherwise clear day.  He had sufficient time to identify
the individual.  In Manson, for example, the Supreme Court upheld
the reliability of an identification made by a police officer who
viewed the suspect for approximately "two to three minutes" near
sunset.  432 U.S. at 114; see also de Jesus-Rios, 990 F.2d at 678
n.6 (finding that the witness had "ample time" when he viewed the
suspect "for at least five minutes."); United States v.
Eatherton, 519 F.2d 603, 606, 609 (1st Cir. 1975) (finding
identification reliable where witness, a high school senior,
viewed suspect for "about a minute"); but see Smith, 429 F. Supp.
2d at 451 (finding a "mere forty-five seconds" insufficient time
to observe).  Lt. Det. Stewart's vantage point also was

13

sufficiently close to allow him to observe the defendant.  A distance of fifty feet, while longer than the two feet distance in Manson, is still relatively near.  It is not unlike the difference between a person at sidebar and a person at the back of the courtroom.  (See Tr. 13).  Finally, though the size of the window area he used was small, nothing obstructed Lt. Det. Stewart's view, the day was clear, and the defendant at all times was in front of him.  Cf. Smith, 429 F. Supp. 2d at 451 (finding opportunity to observe limited where witness was in front seat of car and unknown man was in back seat).

        2.   The Degree of Attention

    Lt. Det. Stewart exercised a sufficient degree of attention to make his identification reliable.  Lt. Det. Stewart was not a "casual or passing observer," Manson, 432 U.S. at 115, nor under any duress such as a victim of a violent crime.  See United States v. Johnson, 412 F.2d 753, 755 (1st Cir. 1969) (noting difference between officers and "a witness to a violent crime whose perceptions may be suspect because of the extreme anxiety of the moment.").  Instead, Lt. Det. Stewart paid specific attention to the defendant as part of his duties as a surveillance officer for the investigation.  Moreover, as a surveillance officer and an officer of the Scituate Police Department for twenty-four years, Lt. Det. Stewart "would have been aware of the importance of an accurate identification because of his training and experience and therefore it is logical to conclude that he was sufficiently attentive." United

                            14

States v. Fields, 871 F.2d 188, 195 (1st Cir. 1989) (finding reliable an identification made by experienced police officer working as a part time security guard at the time of the observation) (emphasis added).

The defendant's contention that Lt. Det. Stewart's degree of attention was not sufficient are unavailing.  At the evidentiary hearing the defendant argued that Lt. Det. Stewart's identification was not entitled to "something greater" because it was not "demonstrated [that] these police officers have specific training or experience on surveillance."  (Tr. 104).  Lt. Det. Stewart, however, testified to his experience as an officer in the Scituate Police Department for twenty-four years, his affiliation with HIDTA, and, most importantly, his assignment as surveillance supervisor.  The Court finds that this experience is sufficient to allow the Court to conclude that Lt. Det. Stewart was aware of the importance of an accurate identification, and thus paid sufficient attention to conduct his task.

    3.   The Accuracy of the Prior Description

The defendant does not contest the accuracy of Lt. Det. Stewart's description, (see Def. Mem. at 11) but contends that Lt. Det. Stewart's prior description was too general, since it only described the unknown individual as a heavyset, short, Hispanic man with a round face, without including a specific height, hair color, eye color, facial hair, or a description of clothing.  (See Tr. 72-74).  Courts have used the accuracy of a prior description as evidence of "the extent of [the witness's]

15

observation of the [suspect] and her ability to recall what she had seen."  See Nassar, 519 F.2d at 801 (crediting description that was later used to construct a sketch of the unidentified individual).  In Smith, for example, the court criticized for its "extraordinary level of generality" descriptions that included, among other things, height, weight, complexion, and age.  429 F. Supp. 2d at 452.[5]  Given the generality of Lt. Det. Stewart's description, the Court finds that it mitigates against the reliability of the identification.

    4.  The Level of Certainty

    Lt. Det. Stewart testified that he had "no doubt whatsoever" that the individual in the photo was the Hispanic male he observed the previous day, (Tr. 19), and the Court finds his testimony credible.  Accordingly, the Court credits Lt. Det. Stewart's level of certainty in establishing the reliability of his identification.  See Manson, 432 U.S. at 115 (finding identification reliable where police officer witness testified that "[t]here is no question whatsoever" as to the identify of the person in photo shown to him).

    5.  The Time Between the Observation and Identification

    Det. Dominguez presented his single photo to Lt. Det. Stewart less than twenty-four hours after Lt. Det. Stewart observed the unidentified Hispanic male.  This is well within the time courts have found sufficient to establish the reliability of

---

[5] The Smith court also noted a number of inconsistencies among the descriptions provided, but nevertheless noted that they "remained relatively consistent."  429 F. Supp. 2d at 452.

an identification.  See, e.g., Manson, 432 U.S. at 116 (finding reliable identification made two days after observation, noting that "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph.").

Based on the totality of the circumstances, the Court concludes that Lt. Det. Stewart's identification of the defendant, based on a single photograph shown to him less than twenty-four hours after he observed the defendant, was otherwise reliable.  Although Lt. Det. Stewart's prior description of the defendant was too general, his opportunity to observe the defendant, his degree of attention, his certainty in identifying the defendant, and the relatively short amount of time between his observation and his identification all otherwise establish the reliability of his identification.

D.    The Admissibility of the In-Court Identification

The defendant further moved at the evidentiary hearing to suppress "any further in-court identification of him being present" on July 13, 2006.  (Tr. 106).  The defendant did not separately brief this point, and did not seek a special procedure for identifying the defendant in the courtroom.  However, the defendant was the only guy in the room in the orange jumpsuit, and the in-court identification procedure was suggestive.  Still, where courts find an out-of-court identification of a defendant admissible, courts frequently find the in-court identification of the defendant also admissible.  See, e.g., Maguire, 918 F.2d at 265 ("Here, we have found the pretrial identification admissible;

17

thus, the in-court identification of [the defendant] based upon it must be admitted."). If the government seeks an in-court identification at trial, it shall notify the defendant and the parties shall brief the reliability factors prior to trial.

### ORDER

The defendant's motion to suppress evidence is **DENIED**.


S/PATTI B. SARIS
United States District Judge